**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MELODY R. ADAMS,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1]

Defendant.

Case No. 13-cv-00044 NC

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 23

Plaintiff Melody Adams seeks judicial review of the Commissioner of Social Security's final decision denying Adams's claim for disability insurance benefits and supplemental security income. The single issue on review is whether substantial evidence supports the Administrative Law Judge's ("ALJ") adverse credibility determination of Adams's subjective symptom testimony in assessing her residual functional capacity. The Court finds that the ALJ properly considered and explained several reasons for discounting Adams's credibility regarding her subjective symptoms and substantial evidence supports his assessment. Accordingly, the Court DENIES Adams's motion for summary judgment.

[1] Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted for her predecessor, Michael J. Astrue, Commissioner of Social Security, pursuant to Fed. R. App. 43(c)(2).

## I. BACKGROUND

### A. Agency Review

On August 2004, Adams filed an application for supplemental security income, alleging disability since May 15, 2003, due to spine and shoulder injuries. (AR 162-65, 188.) The Social Security Administration ("SSA") denied Adams's claim because she had not worked long enough under Social Security to qualify for benefits. (AR 138.) The SSA therefore did not make a determination as to whether she was disabled under its rules. *Id.*

On October 11, 2007, Adams filed a second application for supplemental security income, alleging disability since January 1, 2003, due to spine and shoulder injuries, depression, and anxiety. (AR 68, 166-72.) On March 20, 2008, the SSA determined that her condition was not severe enough to prevent her from working. (AR 68-73.) The SSA stated that although the records show that she experienced discomfort in her back and shoulders, "the medical evidence shows that [she is] able to walk and move about in a satisfactory manner" and there was "no indication of loss of control or muscle wasting in [her] arms and legs due to nerve damage as a result of [her] back and shoulder condition." (AR 68-69.) The SSA further noted that although she was "at times depressed and anxious, [the] records show that [she is] able to think, communicate and act in [her] own interest[,]" "adjust to ordinary emotional stresses," "get along with supervisors and co-workers," and "remember and follow basic instructions." (AR 69.) Although the SSA concluded that she was unable to return to her past occupation and was "precluded from work requiring public contact[,]" she was able to perform other work and thus was not disabled. *Id.*

On May 29, 2008, Adams requested reconsideration of her application, alleging spine and shoulder injuries, vision problems, joint stiffness, headaches, fibroid tumors, anxiety, and depression. (AR 74-78.) Adams did not submit additional evidence to support her claim. (AR 75.) On July 17, 2008, the SSA notified Adams that it had reviewed her claim and found that its March 20, 2008, decision was correct. (AR 78-82.) Citing the same reasons from its March 20, 2008, decision, the SSA again concluded that Adams's physical and mental condition did not significantly restrict her from working. (AR 78-79.)

**B. Administrative Review**

On September 10, 2008, Adams requested an administrative hearing regarding the SSA's May 29, 2008, decision. (AR 83-86.) At a hearing before ALJ Michael Blume on October 13, 2009, Adams testified about her neck and back pain. (AR 29-46.) Medical expert Anthony Frances and vocational expert Jeff Clark also testified. (AR 46-64.)

In his decision dated January 29, 2010, the ALJ analyzed Adams's claims under the five-step evaluation process for determining disability under 20 C.F.R. § 416.920 and concluded that Adams was not disabled. (AR 13-28.) The ALJ found that Adams was not currently engaged in substantial gainful activity (step one). (AR 15.) The ALJ determined that Adams had medically severe impairments, including a history of uterine fibroids, minimal degenerative changes of the lumbar spine, arthritis of the thoracic spine, degenerative disc disease and spondylosis of the cervical spine, depressive disorder, pain disorder with psychological factors affecting general medical condition, and polysubstance abuse (step two). (AR 15-16.) The ALJ found that Adams did not have an impairment or combination of impairments that met or equaled a listed impairment under 20 C.F.R. pt. 404, subpt. P, app. 1 ("Listed Impairments"), and that she was unable to perform her past relevant work (steps three and four). (AR 18-19.) The ALJ concluded that Adams had the residual functional capacity ("RFC") to "perform light work as defined in 20 C.F.R. [§] 416.967(b)" and could "understand, remember and carry out simple instructions with limited contact with the general public"[2] (step five). (AR 19.)

In evaluating Adams's RFC, the ALJ also considered Adams's subjective symptom testimony – namely, that Adams felt she was unable to work due to the severity of her neck and back pain, inability to turn her neck, left-sided numbness, and depression. (AR 23.)

[2] Regarding the specific limitations imposed by Adams's mental impairments, the ALJ relied on Disability Determination Services psychiatric consultant Dr. Kelly Loomis's opinion. (AR 22.) Based on Dr. Loomis's opinion, the ALJ concluded that Adams was "*moderately* limited in the ability to understand, remember and carry out detailed instructions; *moderately* limited in the ability to interact appropriately with the general public; but that she was able to understand, remember and carry out one and two-step instructions, maintain concentration, persistence and pace throughout a normal workday and workweek, and interact appropriately with coworkers and supervisors." (AR 22, 359, 364-66.) (emphasis added).

After evaluating Adams's testimony and the entire case record, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above RFC assessment." *Id.* The ALJ detailed five specific reasons why he found Adams not credible: (1) she appeared to "overstate her symptoms and limitations"; (2) she had "drug seeking behavior"; (3) she "fail[ed] to follow prescribed treatment"; (4) she "did not work even before she allegedly became significantly impaired"; and (5) she has a criminal record "showing a propensity for a disregard for societal norms." (AR 24-26.) Although the ALJ found that Adams would be unable to return to her past work as an in-home health attendant, he accepted the vocational expert's testimony that, given her limitations, she would be able to perform the occupation of a "Surveillance System Monitor." (AR 26-27.) The ALJ ultimately concluded that a finding of "not disabled" was appropriate because "considering the claimant's age, education, work experience, and RFC, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (AR 28.)

In February 2010, Adams requested that the Appeals Council review the ALJ's decision. (AR 7-8.) In March 2010, the Appeals Council denied Adams's request for review. (AR 1-3.)

**1. Adams's First Appeal to the District Court**

In May 2010, Adams filed an appeal from the commissioner's final determination. Case No. 10-cv-02008 DMR, Dkt. No. 1. In November 2010, Adams moved for summary judgment on the grounds that the requirements of a Surveillance System Monitor, as described in the Dictionary of Occupational Titles ("DOT"),[3] conflicted with the ALJ's determination of her RFC. *Id.* at Dkt. No. 21. The Court found that (1) there were conflicts between the vocational expert's testimony and the DOT; and (2) the ALJ erred by

[3] The DOT is a reference guide that contains occupational information about various jobs. *Id.* at Dkt. No. 23 at 2.

not inquiring into whether the vocational expert's testimony conflicted with the DOT and by not providing an explanation for the deviation from the DOT. *Id.* at Dkt. No. 23 at 8-9. Adams did not challenge and the Court did not address the ALJ's credibility findings regarding Adams's subjective pain and symptom testimony. *Id.* at Dkt. Nos. 21, 23 at 1-11. The Court granted Adams's motion for summary judgment and remanded in May 2011. *Id.* at Dkt. No. 23 at 11. In June 2011, the Appeals Council implemented the Court's order and remanded the case for a new hearing. (AR 595.)

**2. Adams's Testimony at the July 26, 2012, Hearing**

In July 2012, Adams testified at a hearing before ALJ Michael Blume about her back, neck, and teeth pain, medication use, doctor-recommended treatment, and drug use. (AR 524-35.) Medical expert S. Meldrin Dorinson and vocational expert Mary Ciddio also testified. (AR 535-48.)

Adams is a fifty-three year old woman who last worked as an in-home health care provider in 2006. (AR 525, 888.) She quit her job because of neck and back pain. (AR 525-26.) At the time of the hearing, Adams testified that she still has "significant pains" in her back and neck. (AR 527, 536.) Sometimes her legs feel numb and her arms and hands "lock up" to where she cannot "write or pick up anything." (AR 525, 536.) Since the first hearing in 2009, she is having "more difficulties" because she is losing her teeth, which is causing toothaches and headaches. (AR 527.) She is in constant pain and cannot sleep at night because of her teeth. (AR 531.) Adams is not getting dental care because she does not have medical insurance. (AR 528-29.)

Adams takes a variety of medication. (AR 527-28.) She takes antibiotics for her teeth, antidepressants, high blood pressure medication, and cholesterol medication. *Id.* To address her pain, Adams takes methadone and another medication, which cause her to be "tired all of the time" and "not to be able to do anything." (AR 527, 533.) Adams testified that she lies down "[a]ll -- mostly all day. Well, I'm going to say all day, but let's say 12 hours out of the day, I'm laying." (AR 533.) She estimates that she would be able to be up for an "hour or so" before having to lie back down. *Id.*

Regarding care other than medication, Adams testified that "[t]hey wanted to give me surgery." (AR 529.) When asked who had recommended surgery, Adams claims that consultative orthopedist Dr. Norman Livermore said that she could have surgery or do physical therapy. (AR 529-30.) She later acknowledged that Dr. Livermore ultimately concluded that she did not need surgery and had recommended therapy. *Id.* Since Dr. Livermore's recommendation, Adams has not had any treatment for her neck besides taking pain medications. (AR 530.)

The ALJ also inquired about Adams's drug use, and she testified that she had not taken street drugs for at least two years. (AR 529.) When asked about the positive toxicology screening for cocaine in 2011, she said that she did not know why it was positive because she had not used cocaine. *Id.* Later in her testimony, however, Adams provided a different answer: that she did have a small relapse and could have been mistaken about the two years. (AR 534-35.) Prior to the relapse, Adams estimates that she had been drug free "[s]ince 2009. Yeah, [since] 2008. I think since I last seen him, seen doctor -- seeing the judge." (AR 535.)

**3. The ALJ's Findings**

On September 24, 2012, the ALJ issued his decision, conducting the five-step disability evaluation. (AR 495-507.) At step one, the ALJ found that Adams was not currently engaged in substantial gainful activity. (AR 499.) For steps two through four, the ALJ adopted his findings from his January 29, 2010, decision for the time period of October 11, 2007, through September 21, 2010. (AR 499-500.) At step five, the ALJ noted that, as indicated in the May 2011 Court order, "there is some question as to whether the claimant could actually satisfy the requirements of [a Surveillance System Monitor]." (AR 500.) He further noted that the vocational expert at the July 2012 hearing stated that there were no positions available for an individual with Adams's limitations. *Id.* Thus, the ALJ concluded that Adams was disabled from October 2007 through September 21, 2010. (AR 501.)

The ALJ then conducted a seven-step disability analysis to determine whether Adams's disability continued from September 22, 2010, through the date of his decision. (AR 501-07.); *see* 20 C.F.R. § 416.994. On September 22, 2010, consultative clinical psychologist Dr. Ute Kollath had conducted a psychological evaluation of Adams. (AR 887-93.) The ALJ summarized, and found persuasive, Dr. Kollath's findings:

> [Adams] had *mildly* impaired ability to follow complex/detailed instructions; to maintain adequate pace or persistence to perform complex tasks; to maintain adequate attention/concentration; and *no* limitations in the ability to follow simple instructions; to maintain adequate pace or persistence to perform one- or two-step simple repetitive tasks; to adapt to changes in job routine; to withstand the stress of a routine workday; to interact appropriately with coworkers, supervisors, and the public on a regular basis; and to adapt to changes, hazards, or stressors in a workplace setting.

(AR 501, 891-92.) The ALJ also noted that Dr. Kollath diagnosed Adams's crack cocaine dependence as being in full remission. (AR 501.) Based on these findings, the ALJ found that Adams's "moderately" impaired mental limitations from the last diagnosis had improved to "mildly" or "not" impaired as of September 22, 2010. (AR 501-02.) "Because [Adams's] medically determinable mental impairment causes no more than 'mild' limitation . . . it is nonsevere" and did not meet or medically equal the severity of one of the Listed Impairments. *Id.* "Thus her current impairments are the same as those present from October 11, 2007, through September 21, 2010, with the exception of her mental impairment." (AR 501.) Because the ALJ found that Adams did not have a "severe mental impairment" and had not developed any new impairment since September 22, 2010, he concluded that "medical improvement" had occurred. (AR 502.)

The ALJ further found that Adams's medical improvement related to and increased her RFC. (AR 501-02.) The ALJ concluded that Adams had the RFC "to perform the full range of light work as defined in 20 C.F.R. [§] 416.967(b) involving nonpublic simple repetitive tasks." (AR 502-06.) In making this determination, the ALJ found that Adams's medical impairments could be expected to produce the alleged pain symptoms given the medical evidence in the record. (AR 504.) The ALJ determined, however, that Adams's statements concerning the intensity, persistence, and limiting effects of these symptoms

were not credible beginning September 22, 2010. *Id.* Finally, the ALJ relied on a vocational expert who testified that there were a significant number of jobs in the national economy that Adams could perform. (AR 505-06.) The ALJ concluded that Adams's disability ended on September 22, 2010. (AR 506.)

Adams did not seek review of the ALJ's September 2012 decision before the Appeals Council and it therefore became the final decision of the Commissioner. In January 2013, Adams filed a complaint in this Court for review of the ALJ's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Dkt. No. 1. All parties have consented to the jurisdiction of a United States magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 10, 19.

## II. STANDARD OF REVIEW

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the [final] decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). "When the Appeals Council denies a request for review, . . . the ALJ's decision becomes the final decision of the Commissioner." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). The decision of the Commissioner should only be disturbed if it is not supported by substantial evidence or it is based on legal error. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation and quotation omitted). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (internal citation and quotation omitted). It is evidence that a reasonable mind would accept as adequate to support the conclusion. *Burch*, 400 F.3d at 679. "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal citation and quotation omitted).

## III. DISCUSSION

Adams's challenge to the ALJ's decision on appeal is limited to the ALJ's adverse credibility determination of Adams's subjective symptom testimony in assessing her RFC

under step seven of the seven-step continued disability analysis. *See* 20 C.F.R. § 416.994.

Disability claims are initially evaluated using a five-step sequential analysis. 20 C.F.R. § 416.920. At step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. *Id.*; *Burch*, 400 F.3d at 679. At step two, the ALJ evaluates whether the claimant has a medically severe impairment or combination of impairments. *Id.* At step three, the ALJ considers whether the impairment or combination of impairments meets or equals any of the Listed Impairments under 20 C.F.R. pt. 404, subpt. P, app. 1. *Id.* At step four, the ALJ assesses whether the claimant is capable of performing her past relevant work. *Id.* At step five, the ALJ examines whether the claimant has the RFC to perform any other substantial gainful activity in the national economy. *Id.* If the ALJ reaches step five and determines that the claimant has the RFC to perform other gainful activity, the claimant is not disabled. *Id.*

To determine whether a claimant continues to be disabled, an ALJ must follow a seven-step sequential evaluation. 20 C.F.R. § 416.994. At step one, the ALJ considers whether the impairment or combination of impairments meets or equals any of the Listed Impairments under 20 C.F.R. pt. 404, subpt. P, app. 1. *Id.* At step two, the ALJ assesses whether there has been medical improvement, such as any decrease in the medical severity of the impairment(s). *Id.* At step three, the ALJ considers whether the improvement is related to the claimant's ability to work and whether the claimant's RFC has increased. *Id.* At step four, if the ALJ found no medical improvement (step two), or that the improvement was not related to the claimant's ability to work (step three), the ALJ determines whether an exception to medical improvement applies. *Id.* At step five, the ALJ will determine whether the claimant's impairments in combination are severe. *Id.* At step six, the ALJ assesses the claimant's RFC based on the current impairment(s) and whether the claimant is capable of performing her past relevant work. *Id.* At step seven, the ALJ examines whether the claimant has the RFC to perform any other work. *Id.* If the ALJ reaches step seven and finds that the claimant has the RFC to perform other work, the claimant's disability has ended. *Id.*

A claimant's RFC is what she can still do despite her physical, mental, and other limitations. *See Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001); *see also* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(c). In determining a claimant's RFC, the ALJ "must take into account the claimant's testimony regarding his capability, [and] the ALJ must assess that testimony in conjunction with the medical evidence." *Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir. 2012). Part of this testimony assessment is evaluating the claimant's credibility regarding subjective pain, as pain can have "severe debilitating effects" to the point of disabling a person. *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (internal quotation omitted); *see also* 20 C.F.R. § 404.1545(e). First, the ALJ must determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation omitted). Second, if the claimant meets the first prong and there is no affirmative evidence of malingering, the ALJ must give "clear and convincing reasons" why the claimant's testimony of pain is not credible. *Burch*, 400 F.3d at 680. The ALJ may consider the claimant's reputation for truthfulness, testimony from physicians and third parties concerning the nature, severity, and effect of the pain, and inconsistencies either in her testimony or between her testimony and her conduct. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citations omitted). When substantial evidence supports an ALJ's specific findings regarding a claimant's credibility, a court may not second-guess that decision. *Thomas*, 278 F.3d at 959.

In this case, the ALJ concluded that Adams had the RFC "to perform the full range of light work as defined in 20 C.F.R. [§] 416.967(b) involving nonpublic simple repetitive tasks[,]" of which there were a significant number of jobs in the national economy. (AR 502-06.) The ALJ found that the severity of Adams's claimed impairments could reasonably be expected to produce the alleged symptoms, but found that Adams's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not credible beginning September 22, 2010, to the extent that they are inconsistent

with the residual functional capacity assessment." (AR 504-05.) In determining that Adams's statements about the severity of her symptoms were not credible, the ALJ articulated the following reasons: (1) the objective medical findings; (2) that Dr. Livermore recommended conservative treatment; (3) that no doctor had offered surgery or epidural steroid injections; (4) the lack of evidence of emergency room visits for neck or back pain; (5) Adams's failure to follow her prescribed treatment; (6) her inconsistent statements regarding drug use; and (7) her exaggerated statements regarding vision and hearing loss. (AR 505.) The ALJ stated that these reasons indicated that "[w]hile [Adams] may have some pain, it appears that she exaggerates her limitations . . . ." *Id.* The Court finds that the ALJ provided clear and convincing reasons for his adverse credibility determination regarding Adams's testimony about the severity of her pain, which are supported by substantial evidence in the record.

First, the ALJ found that Adams's subjective symptoms lacked substantial support in the objective medical record. *Id.* The ALJ noted that there were few, if any, objective clinical findings documented in primary care physician Dr. Micaela Godzich's treatment notes. (AR 503, 505, 955-67.) The ALJ also noted that the September 2010 cervical spine MRI showed no significant interval change in Adams's degenerative disc disease since the prior study. (AR 505, 968-69.) The ALJ found that, despite Adams's claims of debilitating pain, consultative family physician Dr. Alberto Carandang's internal medicine report revealed well-developed musculature with no atrophy and normal neurologic examination. (AR 505, 893-95.) The ALJ cited to Dr. Livermore's February 2011 assessment, which found no signs of cervical myelopathy or other nerve root entrapment syndrome and no etiology to explain the right arm and leg numbness. (AR 505, 992.)

Although the record indicates that Dr. Livermore also found cervical degenerative disc disease with mechanical neck pain, and mechanical low back pain and spasm, he ultimately recommended that Adams be "treated conservatively" for her back and neck pain, as the ALJ noted. *Id.* This "conservative treatment" included "medications of reasonable nature, physical therapy, acupuncture, Pilates, and other physical modalities to

improve the function of her muscles and the limberness of her spine." *Id.* Evidence of conservative treatment suggests a lower level of pain. *See Johnson*, 60 F.3d at 1434. A discrepancy between a claimant's allegations of pain and evidence of conservative treatment by doctors therefore undermines a claimant's credibility. *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007).

The ALJ also relied on the fact that no doctor had ever offered surgery or epidural steroid injections. (AR 505.) In making a credibility assessment, an ALJ may properly consider whether the claimant has undergone any treatment, other than medication, for the pain. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). The record shows that Adams told both Dr. Carandang and Dr. Livermore that another doctor had advised her to have an operation for her spinal stenosis. (AR 893, 991.) At the July 2012 hearing, the ALJ inquired about Adams's neck care and she testified as follows:

> Adams: They wanted to give me surgery, but because I don't have any medical, the --
>
> ALJ: Who recommended surgery?
>
> Adams: My Dr. Livermore -- I went to see a doctor called Dr. Livermore. At the time he said I could have the surgery, or I could have the therapy. He said if I had the surgery, it's not in record, it's not a guarantee that the surgery would correct the problem, so he said that being that I was having all of these other things and if they were giving me so much stuff that he prefers that I have the therapy. Okay. But he said that if I needed -- they -- wasn't likely, I would eventually need to have some surgery again.
>
> ALJ: Yeah. Yeah. The way I read his report, he recommended you not [have] surgery.
>
> Adams: Right.
>
> ALJ: Have you --
>
> Adams: He recommended I have the therapy.

(AR 529-30.) Although Adams initially claimed that Dr. Livermore had recommended surgery, she later acknowledged that he had actually recommended therapy. (AR 529-30, 992.) The record also shows that Adams has not had any treatment for her neck besides taking pain medications in the relevant time period. (AR 530.) Thus, as the ALJ noted, there is no evidence in the record of a physician offering Adams surgery or epidural steroid

injections. (AR 505, 887-1000.) In addition, the ALJ noted that Adams has never been to the emergency room for neck or back pain. (AR 505.) The record does not contain any evidence to the contrary. (AR 887-1000.)

Second, the ALJ found that inconsistencies between Adams's statements and conduct undermined her credibility regarding her subjective symptom testimony. (AR 505.) One such inconsistency that the ALJ relied on in his credibility assessment was Adams's failure to follow her prescribed treatment. *Id.* "[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). The record shows that, in August 2010, Dr. Godzich reduced Adams's prescribed methadone from three times a day to daily, as needed use, when Adams reported that she did not use it consistently every day and it was not showing up in her toxicology screenings. (AR 962.) In November 2010, Dr. Godzich again noted that toxicology screenings were often negative for methadone. (AR 964.) Dr. Godzich prescribed Adams methadone but told her that it needed to start showing up in her urine. *Id.* In January 2011, the toxicology screening was negative for methadone, but positive for cocaine. (AR 978.) In March 2011, the toxicology screening was again negative for methadone. (AR 981.) Dr. Godzich noted that Adams wanted to resume taking methadone, but that Dr. Godzich would only be comfortable prescribing it if Adams was able to submit six months of normal toxicology screens that did not demonstrate any evidence of substance abuse. (AR 966.) In May 2011, the toxicology screening was negative for methadone. (AR 983.) In June 2011, Dr. Godzich prescribed Adams methadone. (AR 960.) In July 2011, the toxicology screening was positive for methadone, but in September 2011, the toxicology screening was again negative for methadone. (AR 987, 893.)

Additionally, the ALJ relied on Adams's inconsistent statements regarding substance abuse. An ALJ can use inconsistent statements about drug use to infer dishonesty in a claimant's other statements. *Thomas*, 278 F.3d at 959. As the ALJ notes, in September 2010, Adams denied any history of cocaine or methamphetamine use to Dr. Carandang, but

a January 2011 toxicology screening was positive for cocaine. (AR 505, 894, 978.) (Dr. Carandang's notes regarding Adams's "social history" include: "She smoked marijuana for 20 years and she is still doing it. She denies any cocaine or methamphetamine."). In addition, the record shows that Adams denied a history of drug use on a medical questionnaire for Dr. Livermore in January 2011. (AR 997.) Thus, Adams's statements to her various doctors about her drug use were inconsistent.

At the July 2012 hearing, Adams provided inconsistent testimony about her drug use:

> ALJ: Okay. Are you using any street drugs?
>
> Adams: No more street drugs.
>
> ALJ: When did you stop?
>
> Adams: Oh my God, at least two years ago. And I only stopped then, your honor, to be honest with you, only stopped then because of all of the other drugs, the medications that I was on, the street drugs was doing no good.
>
> ALJ: Okay. So two years ago would be sometime in 2010?
>
> Adams: Right.
>
> ALJ: Okay. There was a positive test for cocaine in 2011.
>
> Adams: I don't know why, but I haven't used, your honor, and that's a promise to God that I haven't.

(AR 529.) Adams was also examined by her own attorney:

> Atty: [Y]ou had been substance abuse free for a while, but you had some small relapse around that time in March 2011?
>
> Adams: Exactly.
>
> Atty: Have you had any other since then?
>
> Adams: Never. Never. Never touched the stuff again in my life . . . I said two years, it could have mistaken, it could have been around that time. But the reason why I was then is because of my tooth at that time, my tooth was hurting, my tooth was starting to hurt me so bad that I thought maybe that would help, because I was still taking medications, but then I found out that that was making it worse as well.

(AR 534-35.) Thus, while Adams initially told the ALJ that she did not know why the toxicology screening was positive and denied using cocaine, she provided a different response to her attorney at the same hearing.

Finally, the ALJ found that Adams's inconsistent statements regarding her vision and hearing difficulties undermined her credibility regarding her subjective symptom testimony

because "she told Dr. Carandang that she had been having vision difficulties for one year and hearing loss for 20 years . . . but an ophthalmological examination in November 2010 shows best possible correction as 20/25 bilaterally . . . and there were no observable auditory difficulties at the hearing or at any medical examination." (AR 505.) The record shows that Adams told Dr. Carandang about her vision problems in September 2010 and he found her vision to be 20/100 bilaterally without glasses. (AR 894-95.) In November 2010, Adams had an ophthalmological exam that found her vision to be 20/80 and 20/60 with best possible correction at 20/25. (AR 911.) In December 2010, state agency medical consultant Dr. F. Kalmar found that although Adams had some decreased vision, her visual limits did not meet the disability listing levels. (AR 917, 919.) The record also shows that Dr. Kalmar did not find any established hearing limitations. (AR 918.) There is no other evidence in the record of a hearing examination finding hearing loss or any doctor having trouble communicating with Adams. (AR 887-1000.)

Despite these findings, Adams argues that "the ALJ decision is void of any sufficient rationale at all as to why the ALJ ignored and disregards Ms. Adams' testimony." Dkt. No. 23 at 6-7. Adams appears to assert three main reasons why the ALJ did not properly conduct her credibility determination: the ALJ (1) was not sufficiently specific; (2) improperly based his credibility determination on the lack of objective medical evidence; and (3) improperly considered Adams's daily activities. *Id.* at 6-8, 10. The Court finds that these arguments lack merit.

Regarding the first and second assertions, the ALJ listed several specific reasons why Adams was not credible and cited to supporting evidence from the record. (AR 505.) The lack of objective medical evidence was just one factor out of the several discussed. When evaluating a claimant's credibility regarding pain, "an ALJ may not reject a claimant's subjective complaints based *solely* on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch*, 400 F.3d at 680 (emphasis added). Here, the ALJ's decision was not based "solely" on the lack of objective medical evidence. Instead, the ALJ provided other reasons as to why he discounted Adams's testimony about the severity of her

pain, which are supported by substantial evidence in the record.

Adams's third argument is that the ALJ improperly assessed her daily activities by not considering "the differences between Ms. Adams' daily activities and her ability to work eight hours a day, five days a week" and ignoring "*how* Ms. Adams performs her activities . . . ." Dkt. No. 23 at 10. In assessing Adams's credibility, however, the ALJ did not rely on or even discuss Adams's daily activities. Thus, the ALJ did not improperly consider Adams's daily activities compared to her ability to work.

After reviewing the record, the ALJ made specific findings regarding Adams's credibility as it related to her subjective symptom testimony, which are supported by substantial evidence. Accordingly, the Court does not second-guess the ALJ's decision.

## IV. CONCLUSION

After considering Adams's testimony and the record, substantial evidence supports the ALJ's assessment of Adams's credibility regarding her subjective symptom testimony. Accordingly, Adams's motion for summary judgment is DENIED and the final decision of the Commissioner is AFFIRMED. 42 U.S.C. § 405(g).

IT IS SO ORDERED.

Date: March 31, 2014

Nathanael M. Cousins
United States Magistrate Judge